### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CHRISTIAN BRACHVOGEL,**<br>on behalf of himself and all others similarly situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>**SOUTH BAY ENERGY CORP.**<br>                              Defendant. | Civil Case No.: 23 Civ. 184<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Christian Brachvogel (hereinafter "Mr. Brachvogel" or "Plaintiff"), by his attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, brings this proposed class action in his individual capacity, and on behalf of a class of consumers defined below, against Defendant South Bay Energy Corp. (hereinafter "South Bay" or "Defendant") and hereby alleges the following with knowledge as to his own acts, and upon information and belief, as to all other acts:

### <u>NATURE OF THE CASE</u>

1.      This action seeks to redress South Bay's deceptive and bad faith pricing practices that have caused thousands of commercial and residential customers in New York, New Jersey, Pennsylvania, Ohio, and Illinois to pay considerably more for their electricity and gas than they should otherwise have paid.

2.      South Bay is an independent energy service company ("ESCO").  Defendant has taken advantage of the deregulation of the retail electricity market by exploiting consumers hoping to save on electricity and gas costs.

3.      South Bay uniformly represents to its New York customers that its variable rates for electricity will reflect "the cost of energy, capacity, RECs, settlement, ancillaries, related transmission and distribution charges and other market-related factors; plus all applicable taxes, fees, charges, costs, expenses and margins."[1]  Similarly, South Bay uniformly represents to its New York customers that its variable rates for gas will reflect "market conditions."[2]

4.      Upon information and belief, Mr. Brachvogel was subject to the same contractual terms for his variable rate for electricity as all South Bay customers in New York, which is substantially similar to the variable rate contractual terms for all of South Bay's customers in the United States.

5.      South Bay's representations are false and deceptive, and designed to take advantage of consumers' good faith and their lack of knowledge about, and access to, accurate wholesale and retail energy pricing information.  In reality, South Bay did not provide its customers with prices based upon market-related factors or market conditions, but rather used a pricing methodology that focused on maximizing profits.

6.      As a result of South Bay's unlawful acts described herein, thousands of unsuspecting consumers have been, and continue to be, fleeced by South Bay out of millions of dollars in exorbitant charges for electricity and gas.  Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

---

[1] Attached as Exhibit A is South Bay's Terms and Conditions for New York Electricity customers that makes these representations.  *See* https://southbayenergy.com/t%26c (last visited Jan. 9, 2023).

[2] Attached as Exhibit B is South Bay's Terms and Conditions New York Gas customers that makes these representations.  *See* https://southbayenergy.com/t%26c (last visited Jan. 9, 2023).

7.      Plaintiff and other South Bay customers (the "Class") have been injured by Defendant's unlawful practices.  Plaintiff and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for South Bay's breach of contract, breach of the duty of good faith and fair dealing, violation of state consumer protection statutes, and unjust enrichment.

8.      Only through a class action can South Bay's customers remedy Defendant's ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge South Bay's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Further, many customers do not realize they are victims of South Bay's deceptive and unlawful conduct.  With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like South Bay engage in fair and upright business practices.

## PARTIES

9.      Plaintiff resides in Philadelphia, Pennsylvania.  Mr. Brachvogel leased property in the borough of Manhattan in New York City and received his electricity supply from South Bay in Manhattan.  South Bay began supplying Plaintiff's electricity in the spring of 2014.  Plaintiff was a South Bay electricity customer until January 2021.  Unbeknownst to Plaintiff, South Bay charged him exorbitant rates every month.

10.      As a result of Defendant's deceptive and otherwise improper and unauthorized conduct, Mr. Brachvogel incurred excessive charges for electricity.

11.      Defendant South Bay Energy Corp. is a New York corporation headquartered at 700 Veterans Memorial Highway, Suite 210, Hauppauge, New York, 11788.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

12.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

### *Personal Jurisdiction*

13.     This Court has general personal jurisdiction over South Bay because South Bay is incorporated and headquartered in New York, and thus a citizen of New York.

14.     This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution, and sale of electricity and gas to New York consumers.

### *Venue*

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).  Substantial acts in furtherance of the alleged improper conduct occurred within this District.  From Spring 2014 to January 2021 South Bay supplied electricity to the property leased by Mr. Brachvogel, which is located in the Lower East Side of Manhattan.

## FACTUAL ALLEGATIONS

### *The History Of Deregulation And ESCOs' Role In Electricity Markets*

16.     In the 1990s, numerous state legislatures and state regulatory agencies, including the New York Public Service Commission ("NYPSC"), deregulated the market for retail energy supply.  Among the goals of deregulation were increased competition, with an eye towards reducing energy rates consumers and small businesses pay.  As a result, the gas and electricity

supply market is open to competition, and consumers and small businesses may choose their energy supplier.

17.     Since New York opened its retail gas and electric markets to competition, approximately two million New York consumers and small businesses have switched to an ESCO.  Deregulation laws in other states are substantially similar.

18.     ESCOs, the new energy suppliers, compete primarily against local utilities. ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then sell that energy to end-user consumers.  However, ESCOs do not ***deliver*** energy to consumers' homes and businesses, and many, like South Bay, do not produce electricity or gas.  Rather, the companies that produce energy deliver it to consumers' utilities, which in turn deliver it to the consumer.  ESCOs merely buy electricity and gas and then sell that energy to end-users with a mark-up.  Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to consumers.  The local utility also continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply.  The only value that ESCOs add in the electricity and gas markets is their ability to reduce costs to consumers like Plaintiff.  Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

19.     ESCOs are subject to minimal regulation by state utility regulators like the NYPSC.  ESCOs like South Bay do not have to file their rates with regulators, or the method by which those rates are set.

20.     Consumers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility.  For example, in New York, as in many states, the

utilities charge energy supply rates that are consistent with market conditions.  This is because the utilities' rates serve as a simple pass-throughs of the energy supply cost on the New York Independent System Operator's ("NYISO") competitive short-term market (commonly referred to as "real-time" pricing or the "spot market") for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as South Bay incur).  New York utilities purchase energy, ancillary services, and capacity from NYISO's wholesale market daily based on customer consumption and pass actual costs on to their customers—without any markups or profit.  Because utility supply rates do not include any profits, they serve as pure reflections of the monthly average market costs of wholesale electricity and associated costs.

21.     ESCOs like South Bay can purchase wholesale electricity and gas using the exact same daily market as utilities at the exact same prices.

22.     Indeed, ESCOs such as South Bay have more options to acquire electricity and gas than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing energy in advance of the time it is used by consumers, for example by purchasing futures contracts for the delivery of electricity and gas in the future at a predetermined price.  The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce energy acquisition costs and pass those savings on to consumers.

23.     Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do.  Yet South Bay's variable rates are consistently and substantially higher than the local utility's and wholly detached from market-

related factors; accordingly, no consumer would ever agree to South Bay's variable rate if they knew the truth. The only way South Bay can retain variable rate customers is by hiding the fact that the primary component of the variable rate is not South Bay's actual costs, but South Bay's unbridled price gouging and profiteering.

24.    South Bay took advantage of deregulation and the lack of regulatory oversight to charge consumers exorbitant rates for electricity and gas. In theory, energy deregulation allows consumers to shop around for the best energy rates, and it allows consumers to take advantage of market-based rates that decline when wholesale costs decline. However, South Bay exploits deregulated markets by consistently charging its customers far more than the local utility for the same energy and failing to adequately disclose how its variable rates are determined.

25.    One of deregulation's main unintended consequences has been the proliferation of ESCOs like South Bay whose business model is primarily based on taking advantage of consumers. As a result of this widespread misconduct, states like New York began enacting post-deregulation remedial legislation meant to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers."[3] As the sponsoring memorandum notes, the ESCO Consumers Bill of Rights, codified as G.B.L. Section 349-d, in 2010 sought to end the exact type of deceptive conduct Plaintiff challenges here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity and natural gas. Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.

\* \* \*

---

[3] ESCO Consumers Bill of Rights, New York Sponsors Memorandum, 2009 A.B. 1558, at 1 (2009).

> High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, short-term "teaser" rates followed by skyrocketing variable prices—many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas. The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.[4]

26.     New York regulators also began to call out the high levels of misconduct that pervaded the state's deregulated energy markets. For example, in 2014 the NYPSC concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion."[5] The NYPSC further noted "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[6] The NYPSC concluded that:

> [A]s currently structured, the retail energy commodity markets for residential and small nonresidential customers cannot be considered to be workably competitive. Although there are a large number of suppliers and buyers, and suppliers can readily enter and exit the market, the general absence of information on market conditions, particularly the price charged by competitors, is an impediment to effective competition . . . .[7]

27.     Statistics from the New York Attorney General's ("NYAG") office confirm the

---

[4] *Id.* at 3-4.

[5] CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 4 (Feb. 25, 2014).

[6] *Id.* at 11.

[7] *Id.* at 10.

pattern of activity this consumer class action seeks to combat.  From at least the year 2000 to the present, the NYAG has investigated numerous ESCOs' deceptive and illegal business practices. These investigations have resulted in multiple settlements providing for extensive injunctive relief and millions in restitution and penalties.

28.     The unlawful conduct of ESCOs like South Bay has been devastating to New York consumers.  For example, "[a]ccording to the data provided by [New York's] utilities, the approximately two million New York State residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have paid if they purchased commodity from their distribution utility during the 36-months ending December 31, 2016."[8]  "Additionally, small commercial customers paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for the same 36-month period."[9]  Combining these two groups, New York consumers have been "'overcharged' by over $1.3 billion dollars over this time period."[10]

29.     New York's low-income consumers have also been hit hard.  The utilities reported that low-income ESCO customers (a subset of the residential customers mentioned above) "collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility."[11]

30.     On December 16, 2016, based on the flood of consumer complaints, negative

---

[8] CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 2 (Mar. 30, 2018).

[9] *Id.* at 3.

[10] *Id.*

[11] *Id.*

media reports, and data demonstrating massive overcharges, the NYPSC prohibited ESCOs from serving low-income customers, because of "the persistent ESCO failure to address (or even apparently to acknowledge) the problem of overcharges to [low income] customers . . . ."[12]

31.   Following the first part of the evidentiary hearing announced in December 2016, on March 30, 2018, NYPSC staff reached the following conclusions about ESCOs in New York:

> [M]ass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.  Rather than fierce ESCO against ESCO price competition working to protect customers from excessive charges, ESCOs have deliberately obfuscated prices and resisted market reforms such that the Commission's decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable.[13]

> * * *

> The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.  Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.

> Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers.   For variable rate

---

[12] CASE 12-M-0476, Order Adopting A Prohibition On Service To Low-Income Customers By Energy Services Companies, at 3 (Dec. 16, 2016).

[13] CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 1 (Mar. 30, 2018).

products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[14]

* * *

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[15]

32.    As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied.[16]  Likewise, when the ESCOs claimed that their provision to consumers of so-called value-added products, such as light bulbs and thermostats, contributed to their excessive rates, NYPSC staff found that "the cost incurred . . . in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[17]  Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is

---

[14] *Id.* at 41–42 (citations omitted).

[15] *Id.* at 86 (citations omitted).

[16] *Id.* at 37.

[17] *Id.* at 87.

explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be

charging a premium for green energy, but they are not actually providing a significant amount of

added renewable energy to customers in New York."[18]

33.    Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and
> more often than not, significantly higher, commodity costs imposed
> by the ESCOs on unsuspecting residential and other mass market
> customers.  These Overcharges are simply due to (1) the lack of
> transparency and greed in the market, which prevents customers
> from making rational economic choices based on facts rather than
> the promises of the ESCO representative, and (2) obvious efforts by
> the ESCOs to prevent, or at least limit, the transparency of the
> market.  These obvious efforts include the lack of a definition for
> "market rate" in their contracts, resulting in the fattening of ESCOs'
> retained earnings.[19]

34.    Then, on December 12, 2019, the NYPSC issued bombshell regulatory changes

that banned, starting in February 2020, the variable rate pricing practices engaged in by South

Bay and impact the entire New York ESCO marketplace.[20]

35.    The NYPSC's press release announcing the new regulations stressed that banning

variable energy rates was intended to "prevent[] bad actors among ESCOs from overcharging

New York consumers" and that the regulations only went forward after "the state's highest court

definitively halted ESCOs' attempts to use litigation to evade and/or delay consumer-protection

---

[18] *Id.* at 69.

[19] *Id*.

[20] CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and
Establishing Further Process ("December 12 Order"), at 108–10 (Dec. 12, 2019), *available at*:
http://www3.dps.ny.gov/W/PSCWeb.nsf/96f0fec0b45a3c6485257688006a701a/3f6ed8de50c630
6185257687006f3a5f/$FILE/15-M-
0127%20Order%20Adopting%20Changes%20to%20the%20Retail%20Access%20Energy%20
Market%20and%20Establishing%20Further%20Process%2012.12.19.pdf (last visited Jan. 9,
2023).

regulation."[21]   The regulations themselves likewise condemn ESCOs' conduct and declare that

deception has become a "business model" in the deregulated energy market:

> Based upon the number of customer complaints that continue to be
> made against ESCOs, and the likely need for increased enforcement
> activities, the large number of ESCO customers that pay significant
> premiums for products with little or no apparent added benefit, . . .
> it appears that a material level of misleading marketing practices
> continues to plague the retail access market.
>
> * * *
>
> The persistence of complaints related to ESCO marketing practices
> is indicative of some ESCOs continuing to skirt rules and attempting
> to avoid accountability as part of their business model.[22]

36.     The NYPSC's variable rate ban followed its two-year investigation of ESCO

practices that culminated in a ten-day evidentiary hearing to examine evidence submitted by 19

parties, and to hear the testimony and cross-examination of 22 witnesses and witness panels.[23]

37.     The NYPSC prefaced the variable rate ban with the observation that variable

energy rates like those Defendant charged Plaintiff and the Class are "[t]he most commonly

offered ESCO product" and that this popular product is frequently provided at "a higher price

than charged by the utilities."[24]   The incongruity of consumers paying ESCOs more for the exact

same energy offered by regulated utilities was not lost on the NYPSC:

> If market participants are unwilling, or unable, to provide material
> benefits to consumers beyond those provided by utilities in

---

[21] Press Release, NYPSC, PSC Enacts Significant Reforms to the Retail Energy Market (Dec. 12, 2019), *available at*:
http://www3.dps.ny.gov/pscweb/WebFileRoom.nsf/Web/51A7902329FEA7B7852584CE005CF88D/$File/pr19110.pdf?OpenElement (last visited Jan. 9, 2023).

[22] December 12 Order at 88–90.

[23] *Id.* at 3–4.

[24] *Id.* at 11.

exchange for a regulated, just and reasonable rate, the market serves
no proper purpose and should be ended.[25]

38.     In fact, the NYPSC found it "troubling" that even after considering reams of

evidence "neither ESCOs nor any other party have shown . . . that ESCO charges above utility

rates were generally – or in any specific instances – justified."[26]  This fact only highlighted the

NYPSC's "long-held concern that many customers may only be taking ESCO service due to

their misunderstanding of [ESCOs'] products and/or prices."[27]  Accordingly, and on this record,

the NYPSC banned variable energy rates like those Defendant charged to Plaintiff and the

Class.[28]  In place of these floating variable rates, the NYPSC required ESCOs to guarantee that

their variable rates would save customers money compared to what the utility would have

charged.[29]  Under the new regulations, if the ESCO charges the consumer more than the utility,

the consumer is owed a refund for the difference.[30]  In this litigation, the difference between

what South Bay charged consumers for the same energy Class members' utilities would have

charged is likely in the tens of millions of dollars.

39.     Moreover, the NYPSC's findings of widespread and unjustified overcharging

underscores and highlights the importance and perniciousness of Defendant's practices

challenged in this lawsuit.  Likewise, the NYPSC's findings that ESCOs' overcharging is

---

[25] *Id.* at 12.

[26] *Id.* at 30.

[27] *Id.* at 31.

[28] *Id.* at 39.

[29] *Id.*

[30] *Id.*

completely unjustified bolsters Plaintiff's claims that Defendant's variable rate pricing practices breached the duty of good faith and fair dealing. ESCOs go undetected because it is virtually impossible for consumers to ferret out the fact that they are being overcharged.

40. In its December 12 Order, the NYPSC faulted ESCOs for concealing critical pricing data from both ordinary consumers *and the NYPSC itself*: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[31]

41. The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[32] and required that ESCO bills show how much the consumer's utility would have charged.[33]

42. New York is not the only state using the overwhelming evidence of consumer harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices.

### Plaintiff's Dealings with South Bay

43. In Spring 2014, South Bay began supplying electricity to the property leased by Plaintiff in Manhattan and it continued to do so until January 2021.

44. South Bay uniformly represents to its New York customers that its variable rates for electricity would reflect "the cost of energy, capacity, RECs, settlement, ancillaries, related transmission and distribution charges and other market-related factors; plus all applicable taxes, fees, charges, costs, expenses and margins."[34]

---

[31] *Id.* at 31.

[32] *Id.* at 33.

[33] *Id.* at 33–34.

[34] Ex. A at 1; *see also* https://southbayenergy.com/t%26c (last visited Jan. 9, 2023).

45.     Upon information and belief, Mr. Brachvogel was subject to the same contractual terms for his variable rate for electricity as South Bay's other New York customers, which are substantially similar to the variable rate contractual terms for all South Bay gas and electric customers in the United States.

46.     In light of South Bay's representations, any reasonable consumer, including Mr. Brachvogel, would reasonably expect that South Bay's variable rates would reflect wholesale market costs and be competitive with Defendant's competitors' rates.

47.     Unfortunately, South Bay did not provide its customers with competitive market variable rates.  Instead, South Bay charged its customers variable rates that were untethered from its costs and market-related factors to maximize its own profits.

48.     Price is the most important consideration for energy consumers.  Given that there is no difference at all in the electricity and gas that ESCOs supply as opposed to the consumer's local utility, the only reason a consumer would switch to an ESCO is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility.

49.     The local utility's rates, like ConEd's (the utility serving Plaintiff's Manhattan property), serve as an ideal indicator of the wholesale cost of energy and the other applicable market-based factors because these rates reflect the wholesale cost of energy and the associated market costs that are the same costs ESCOs like South Bay incur.  In fact, Defendant has a tactical advantage over the utility as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least reflect (if not undercut) market prices, albeit over a longer term.  Therefore, while the utility's rates might not precisely match Defendant's rates, the latter's rates should correlate with the utility's rates and over time should be roughly similar.  Instead, South Bay's rates were wildly incongruent.

50.     The following table compares Mr. Brachvogel's electricity supply rates from South Bay for 23 billing periods, for bills accessible to Plaintiff spanning the two-year period from January 2019 to January 2021, to his local utility ConEd's contemporaneous supply rate.

| Billing Period | South Bay Rate (Cents Per kWh) | ConEd's Supply Costs (Cents per kWh) | Overcharge Percentage |
|---|---|---|---|
| 1/23/2019 - 2/22/2019 | 14.601 | 5.73 | 255% |
| 2/22/2019 - 4/23/2019 | 10.765 | 4.86 | 222% |
| 4/23/2019 - 5/22/2019 | 9.5833 | 6.29 | 152% |
| 5/22/2019 - 6/21/2019 | 12.3744 | 9.87 | 125% |
| 6/21/2019 – 7/23/2019 | 12.2063 | 9.43 | 129% |
| 7/23/2019 - 8/21/2019 | 12.0382 | 7.99 | 151% |
| 8/21/2019 - 9/20/2019 | 11.7688 | 7.35 | 160% |
| 9/20/2019 - 10/21/2019 | 12.7348 | 9.87 | 129% |
| 10/21/2019 -11/20/2019 | 11.0177 | 6.83 | 161% |
| 11/20/2019 - 12/20/2019 | 11.0971 | 5.47 | 203% |
| 12/20/2019 - 1/23/2020 | 12.8303 | 4.76 | 270% |
| 1/23/2020 - 2/24/2020 | 12.9861 | 4.38 | 296% |
| 2/24/2020 - 3/24/2020 | 10.5085 | 4.00 | 263% |
| 3/24/2020 - 4/22/2020 | 10.2617 | 3.55 | 289% |
| 4/22/2020 - 5/21/2020 | 15.116 | 6.02 | 251% |
| 5/21/2020 - 6/22/2020 | 17.2246 | 9.14 | 188% |
| 6/22/2020 - 7/22/2020 | 15.0093 | 13.40 | 112% |
| 7/22/2020 – 8/18/2020 | 14.63785 | 8.65 | 169% |
| 8/18/2020 - 9/21/2020 | 14.2664 | 3.76 | 379% |
| 9/21/2020 - 10/20/2020 | 15.6047 | 7.16 | 218% |
| 10/20/2020 - 11/19/2020 | 15.0081 | 9.29 | 162% |
| 11/19/2020 - 12/22/2020 | 13.9961 | 8.09 | 173% |
| 12/22/2020 - 1/25/2021 | 13.7118 | 7.14 | 192% |

51.     The "Overcharge Percentage" column demonstrates the drastic difference between South Bay's rates for Mr. Brachvogel's account and ConEd's contemporaneous rates. South Bay's rates were more than 150% of ConEd's rates for 20 of the 23 billing periods and were more than 200% of ConEd's rates for 10 of the 23 billing periods.  On average, South Bay's rates were 202% of ConEd's rate.

52.     ConEd's supply rate, charged to those customers in Plaintiff's geography who do not select an ESCO, reflects market prices.  As explained above, ConEd is South Bay's primary competitor in Plaintiff's service territory, and ConEd's rates encompass the average wholesale price of electricity and associated costs over time without any markup, making it an ideal comparator.

53.     The disconnect between ConEd's rates and South Bay's rates further demonstrates that South Bay's rates did not even remotely reflect the market-related factors to purchase electricity.

54.     Not only is ConEd South Bay's primary competitor (as the utility always is), but ConEd's rates are also the best indicator of market prices.  ConEd's rates reflect the rates charged in the competitive short-term public market (also known as "real-time" pricing or the "spot market") for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as South Bay incur) and are set without any markups or profit.  In other words, ConEd purchases wholesale electricity for its customers every day on an open free market and passes those costs onto consumers; South Bay could do the same.  Consequently, ConEd's electricity rates are the ideal comparator here because they are South Bay's primary competitor's rates and represent wholesale market prices for electricity and associated costs.

55.     South Bay should have been able to procure electricity at a lower cost than the utility given its tactical advantages over ConEd.  As explained above, South Bay can purchase electricity from any number of sources using a variety of purchasing and hedging strategies.  Its cost for purchasing electricity, therefore, should have at least reflected, if not undercut, ConEd's prices.

56.     South Bay did not adequately disclose to Plaintiff that its variable electricity rates are consistently and significantly higher than the rates ConEd charges.  South Bay likewise failed to adequately disclose to Plaintiff that in paying Defendant's variable energy rates, he was receiving no added material benefit at a dramatically higher price than if he had bought his energy from ConEd.

57.     A reasonable consumer understands and expects that variable electricity rates will reflect the wholesale price for the commodity, that is, the market price available to South Bay for the electricity it in turn supplies to its retail customers.

58.     However, South Bay's variable rates are much higher than wholesale market prices in New York.

59.     No reasonable customer, including Mr. Brachvogel, would expect an ESCO's variable rate to be artificially inflated beyond any resemblance to the local utility's costs. Indeed, the fact that South Bay's rates were ***frequently*** double (and once triple) ConEd's rates demonstrates the extent of its unscrupulous price gouging.

60.     South Bay knew that its variable rates were consistently and significantly higher than the local utility's rates.

61.     Defendant's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

62.     Moreover, Defendant at no time alerted or informed Mr. Brachvogel that the cost for electricity would be continuously *significantly* higher than the same electricity sold by ConEd.

63.     No reasonable consumer who knew the truth about South Bay's exorbitant rates would have chosen it as an energy supplier.

64.     Other than potential price savings, there is nothing to materially differentiate South Bay from the local utility, and the potential for price savings is the *only* reason any reasonable consumer would become a South Bay customer.

65.     South Bay lulled consumers into purchasing its energy supply via material omissions about its variable energy rates.  Defendant did so to reap excessive profits at the expense of unsuspecting consumers.  Defendant acted with actual malice, or wanton and willful disregard, for consumers' well-being.

66.     In this case, South Bay knew that once it had acquired the consumer's energy account, it could charge high energy rates and many consumers (if not most) would not know, and simply pay the exorbitant charges, month after month.

67.     It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in

the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[35] and "Nudges."[36]

68.     Defendant's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that consumers will compare South Bay's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.  As the NYPSC has observed, "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[37]

69.     Further the table in ¶ 50 demonstrates that there are extended periods of time when the wholesale market price of electricity declined or remained steady, yet South Bay's prices remained consistently high.  South Bay did not adequately disclose this material fact to its prospective or current customers.

70.     No reasonable consumer would expect that South Bay would charge them more than the utility by so much money for so long.

71.     Thus, South Bay's omissions with respect to the rates it would charge were materially misleading.

72.     A comparison of South Bay's rates to prevailing market costs also demonstrates that South Bay does not charge a rate based on market-related factors as it promised.

---

[35] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[36] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

[37] CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 11 (Feb. 25, 2014).

73.     The table below, *see* ¶ 75, identifies (i) the last 23 billing periods (beginning in January 2019) during which Mr. Brachvogel was enrolled in South Bay's variable rate for electricity services, (ii) the variable rate South Bay charged Mr. Brachvogel, (iii) the corresponding "Market Supply Costs," and (iv) the differences between South Bay's rates and the contemporaneous Market Supply Costs ("South Bay's Multiplier").

74.     The Market Supply Costs below are based on the costs that an ESCO incurs supplying a retail customer for each period.  The Market Supply Costs include the weighted day-ahead NYISO prices in Mr. Brachvogel's utility zone, ancillary services costs, capacity costs, and various relatively-small charges related to the NYISO.  These charges are tracked by NYISO's Market Monitor, the external consultant that independently evaluates the New York wholesale electricity market.  NYISO's Market Monitor is appointed pursuant to NYISO's Federal Energy Regulatory Commission regulation and tariff.

75.     Plaintiff's local utility rate reflects the energy and marked-based costs that South Bay and its competitors incur, as well as the rates charged by South Bay's primary competitors (the local utilities).  The Market Supply Costs represent the costs and market factors that are relevant to the costs that South Bay and ESCOs incur in providing energy to retail customers.  Each of these measures reflects the costs that South Bay's competitors, in the regulated or deregulated markets, incur.  That South Bay's rates are so vastly different from the utility rate or the Market Supply Costs demonstrate that South Bay's rates are not reflective of market-related factors.

| Billing Period | South Bay Rate (Cents Per kWh) | Market Supply Costs (Cents per kWh) | South Bay's Multiplier |
|---|---|---|---|
| 1/23/2019 – 2/22/2019 | 14.601 | 6.38 | 229% |
| 2/22/2019 – 4/23/2019 | 10.765 | 5.22 | 206% |
| 4/23/2019 – 5/22/2019 | 9.5833 | 4.84 | 198% |
| 5/22/2019 – 6/21/2019 | 12.3744 | 5.22 | 237% |
| 6/21/2019 – 7/23/2019 | 12.2063 | 8.76 | 139% |
| 7/23/2019 – 8/21/2019 | 12.0382 | 8.13 | 148% |
| 8/21/2019 – 9/20/2019 | 11.7688 | 8.04 | 146% |
| 9/20/2019 – 10/21/2019 | 12.7348 | 10.47 | 122% |
| 10/21/2019 -11/20/2019 | 11.0177 | 12.96 | 85% |
| 11/20/2019 – 12/20/2019 | 11.0971 | 7.10 | 156% |
| 12/20/2019 – 1/23/2020 | 12.8303 | 4.99 | 257% |
| 1/23/2020 – 2/24/2020 | 12.9861 | 4.60 | 282% |
| 2/24/2020 – 3/24/2020 | 10.5085 | 4.74 | 222% |
| 3/24/2020 – 4/22/2020 | 10.2617 | 4.87 | 211% |
| 4/22/2020 – 5/21/2020 | 15.116 | 3.75 | 403% |
| 5/21/2020 – 6/22/2020 | 17.2246 | 6.36 | 271% |
| 6/22/2020 – 7/22/2020 | 15.0093 | 6.06 | 248% |
| 7/22/2020 – 8/18/2020 | 14.63785 | 12.48 | 117% |
| 8/18/2020 – 9/21/2020 | 14.2664 | 7.47 | 191% |
| 9/21/2020 – 10/20/2020 | 15.6047 | 11.45 | 136% |
| 10/20/2020 – 11/19/2020 | 15.0081 | 9.34 | 161% |
| 11/19/2020 – 12/22/2020 | 13.9961 | 10.33 | 135% |
| 12/22/2020 – 1/25/2021 | 13.7118 | 9.86 | 139% |

76.     Again, South Bay's variable rates are consistently and substantially higher than a rate based on Defendant's market supply costs, which further demonstrates that South Bay's rates are not set in accordance with market-related factors.

77.     South Bay's rates are higher than Defendant's Market Supply Costs 22 of 23 months and are on average 193% of Market Supply Costs.

78.     As with the comparison to ConEd's prices, South Bay's rates likewise fail to fluctuate in accordance with Market Supply Costs.  For instance, when the Market Supply Costs steadily declined from $0.1296 to $0.0460 per kWh between October 2019 and February 2020 (declining 64%), South Bay's variable rate rose from $0.1102 to $0.129861 per kWh (rising 18%).  Similarly, between April 2020 and May 2020, Market Supply Costs decreased from $0.04870 to $0.03750 per kWh (decreasing 23%), South Bay's variable rate rose from $0.102617 to $0.15116 per kWh (increasing 47%).  This trend continued throughout Mr. Brachvogel's tenure on South Bay's variable rate.

79.     The cost of wholesale electricity and gas is the primary component of the non-overhead costs South Bay incurs.  As explained above, the other cost factors that may affect its variable rate (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are included in ConEd's rates as well.  These additional wholesale costs are relatively insignificant in terms of the overall costs Defendant incurs to provide retail electricity, and do not substantially fluctuate over time.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates.

80.     Therefore, Defendant's non-overhead cost factors cannot explain Defendant's egregiously high variable rate or the reason its rates are disconnected from changes in wholesale costs.

81.     Indeed, South Bay routinely charges its customers variable rates for electricity that are amongst the highest offered by ESCOs in New York.  According to data from the U.S. Energy Information Administration, South Bay charged it customers the second highest price of

63 ESCOs in New York in 2018, the twentieth highest price of 69 ESCOs in New York in 2019,

the ninth highest price of 64 ESCOs in New York in 2020, and the ninth highest price of 64

ESCOs in New York in 2021.[38]  South Bay's variable rates are also far higher than the average

ESCO rate for electricity, with rates that were 64% higher than average in 2018, 25% higher than

average in 2019, 35%  higher than average in 2020, and 38%  higher than average in 2021.[39]

      82.    Additionally, Defendant's ability to make a profit does not justify its outrageously

high rates.  A reasonable consumer might understand that an ESCO will attempt to make a

reasonable profit by selling consumers retail electricity and gas.  However, such a consumer

would also expect that such profits would be consistent with profit margins obtained by other

suppliers of electricity and gas in their respective markets and that Defendant's profiteering at

the expense of its customers would not be so extreme that its rate bears no relation to market

prices but is instead outrageously higher.

      83.    Given that Defendant has engaged in a series of deceptive acts and omissions for

which it billed consumers and consumers continued to pay, the continuing violation doctrine

applies, effectively tolling the limitations period until the date of South Bay's last wrongful act

against Mr. Brachvogel, which was in January 2021, when South Bay last charged Mr.

Brachvogel substantially more for electricity than the local utility.

## CLASS ACTION ALLEGATIONS

      84.    Plaintiff brings this action on his own behalf and additionally, pursuant to Rule

23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all South Bay

---

[38] *See* Electric Sales, Revenue, and Average Price, U.S. ENERGY INFORMATION ADMINISTRATION,
Table 12, https://www.eia.gov/electricity/sales_revenue_price/ (last visited Jan. 9, 2023).

[39] *See id.*

customers in the United States who were charged a variable rate for electricity and/or gas services by South Bay between May 2014 and the date of judgment.

85.     As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant.  Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing practices—and this case is about the responsibility of Defendant for its knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions.  Upon information and belief, the variable rate provisions in the customer agreements for all of South Bay's customers (the "Class Members") are materially the same.

86.     The Class, preliminarily defined as two subclasses ("Subclasses"), is as follows:

   a.  The Multistate Class, preliminarily defined as all South Bay customers
       in the United States charged a variable rate for electricity and/or gas by
       South Bay.

   b.  The New York Class, preliminarily defined as all South Bay customers
       in the state of New York who were charged a variable rate for electricity
       and/or by South Bay.

87.     Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

88.     Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiff files his motion for class certification.

89.     Plaintiff does not know the exact size of the Class since such information is in the exclusive control of South Bay.  Plaintiff believes, however, that based on the publicly available data concerning Defendant's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Defendant's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

90.     The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

91.     Plaintiff is an adequate class representative.  His claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by the Defendant.  Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

92.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

93.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.   Whether Defendant's omissions are materially misleading;

      b.   Whether Defendant breached its contract with Plaintiff and Class Members by failing to set variable rates in the method dictated by the parties' contract;

    c.   Whether Defendant's conduct violates various state consumer protection statutes;

    d.   Whether Defendant was unjustly enriched as a result of its conduct;

    e.   Whether Defendant violated the duty of good faith and fair dealing in its consumer contracts;

    f.   Whether Class Members have been injured by Defendant's conduct;

    g.   Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

    h.   The extent of class-wide injury and the measure of damages for those injuries.

94.    A class action is necessary because i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

95.    A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

96.    A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

97.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

a.  Whether Defendant's omissions are materially misleading;

b.  Whether Defendant's conduct violates various state consumer protection statutes;

c.  Whether Defendant was unjustly enriched as a result of its conduct;

d.  Whether Defendant violated the duty of good faith and fair dealing in its consumer contracts;

e.  Whether Class Members have been injured by Defendant's conduct; and

f.  Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices.

98.     Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### Breach Of Contract
### (On Behalf Of Both Subclasses)

99.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100.    South Bay customers have customer agreements whose variable rate terms are substantially similar.

101.    Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity and/or gas.

102.    South Bay uniformly represents to its New York customers that its variable rates for electricity would reflect "the cost of energy, capacity, RECs, settlement, ancillaries, related

transmission and distribution charges and other market-related factors; plus all applicable taxes, fees, charges, costs, expenses and margins."[40]

103.    South Bay uniformly represents to its New York customers that its variable rates for gas would reflect "market conditions."[41]

104.    Upon information and belief, Mr. Brachvogel was subject to the same contractual terms for his variable rate for electricity as the other customers in New York, which is substantially similar to the variable rate contractual terms for all South Bay customers in the United States.

105.    Pursuant to the contracts, Plaintiff and the Class paid the variable rates Defendant charged for electricity and gas.

106.    However, Defendant failed to perform its obligations under its contracts to charge rates based upon market-related factors, the factors identified in the contract, and the rates utilities and other ESCOs charge.  Instead, Defendant charged variable rates for electricity and gas that were untethered from the factors upon which the parties agreed the rate would be based.

107.    Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity and/or gas that was higher than it would have been had Defendant based its rate on market-related factors.

108.    By reason of the foregoing, Defendant is liable to Plaintiff and other Class Members for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

---

[40] Ex. A at 1; *see also* https://southbayenergy.com/t%26c (last visited Jan. 9, 2023).

[41] Ex. B at 1; *see also* https://southbayenergy.com/t%26c (last visited Jan. 9, 2023).

## COUNT II
### Breach Of The Implied Covenant Of Good Faith And Fair Dealing
### (On Behalf Of Both Subclasses)

109.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.    Plaintiff and the Class contracted with Defendant for the provision of electricity and/or gas supply.

111.    Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

112.    Under the contract, to the extent Defendant had discretion to set the variable rate for electricity or gas, it was obligated to exercise its discretion in good faith.

113.    Plaintiff reasonably expected that South Bay's variable energy rates would not be continuously and significantly higher than the utility's rates, which provide the same energy supply as South Bay.  Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy electricity or gas from Defendant.

114.    Plaintiff reasonably expected that Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy electricity or gas from Defendant.

115.    Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiff's and other Class Members' reasonable expectations that Defendant's variable energy rate would be commensurate with market-related factors.

116.    As a result of Defendant's breaches, South Bay is liable to Plaintiff and members of

the Class for damages and attorney's fees and expenses.

## COUNT III
### Violation Of New York General Business Law § 349
### (On Behalf Of The New York Class)

117.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

118.    Plaintiff brings this claim under N.Y. GEN. BUS. LAW § 349 on his own behalf and on behalf of each member of the New York Class.

119.    New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW § 349.

120.    Defendant's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

121.    Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW § 349,  including:

  a.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

  b.  Failing to adequately disclose that consumers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

  c.  Failing to provide customers adequate advance notice of the variable rates it would charge;

  d.  Failing to adequately disclose the variable rate methodology South Bay used to calculate its variable rates to enable consumers to potentially compare prices; and

e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

122.   The above deceptive practices and acts by South Bay were material omissions of existing or past facts.

123.   Defendant knew or believed that the above unfair and deceptive practices and acts were material omissions.

124.   The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

125.   Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase electricity or gas from South Bay.

126.   Defendant knew at the time it signed up Mr. Brachvogel and prospective customers that the price of a customer's energy supply was a material factor in choosing South Bay.

127.   Defendant knew at the time it signed up Mr. Brachvogel and prospective customers that a customer's primary alternative to South Bay was the customer's local utility.

128.   Defendant knew at the time it signed up Mr. Brachvogel and prospective customers that South Bay's marketing of variable rates was premised on offering customers a lower energy rate than the customer's local utility.

129.   Defendant knew at the time it signed up Mr. Brachvogel and prospective customers that South Bay's variable rates for electricity and gas were consistently substantially higher than Mr. Brachvogel and prospective customer's local utility rate, a rate based on market factors.

130.    Defendant's omission that South Bay's variable rates for electricity and gas were consistently substantially higher than the local utility rate is material to prospective customers.

131.    Defendant's intentional concealments were designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with market prices as specified in the contract.  By concealing its actual pricing strategy (artificially inflating prices and maximizing profits), Defendant deprived consumers from being able to make informed purchasing decisions.

132.    Defendant's practices are unconscionable and outside the norm of reasonable business practices.

133.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and Class Members remained with South Bay and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a competitive rate based on market pricing, as well as the difference in South Bay's variable rate and the default rate utilities charge, which is the rate Plaintiff and Class Members would have received had the not been deceived into accepting electricity and gas supply from Defendant.  By reason of the foregoing, Defendant is liable to Plaintiff and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

134.    Plaintiff and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. GEN. BUS. LAW § 349, This Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiff and the Class all amounts wrongfully assessed and/or collected.

135.    As a result of Defendant's deceptive acts or practices, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under N.Y. GEN. BUS. LAW § 349.

## COUNT IV
### Violation Of Materially Identical State Consumer Protection Statutes
### (On Behalf Of The Multistate Class)

136.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

137.    Pursuant to the materially identical consumer protection statutes of New York, New Jersey, Pennsylvania, Ohio, and Illinois, consumers are protected against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

138.    South Bay violated at least the following materially identical statutes:

   a.  New York General Business Law § 349;

   b.  New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2;

   c.  Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4);

   d.  Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.02, .03; and

   e.  Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2.

139.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

140.    Defendant's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

141.     Defendant has engaged in, and continues to engage in, deceptive acts and practices, including:

        a.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

        b.  Failing to adequately disclose that consumers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

        c.  Failing to provide customers adequate advance notice of the variable rates it would charge;

        d.  Failing to adequately disclose the variable rate methodology South Bay used to calculate its variable rates to enable consumers to potentially compare prices; and

        e.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

142.     The above unfair and deceptive practices and acts by South Bay were material omissions of existing or past facts.

143.     Defendant knew or believed that the above unfair and deceptive practices and acts were material omissions.

144.     The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

145.     Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase electricity and/or gas from South Bay.

146.    Defendant knew at the time it signed up Mr. Brachvogel and prospective customers that the price of a customer's electricity and/or gas supply was a material factor in choosing South Bay.

147.    Defendant knew at the time it signed up Mr. Brachvogel and prospective customers that a customer's primary alternative to South Bay was the customer's local utility.

148.    Defendant knew at the time it signed up Mr. Brachvogel and prospective customers that South Bay's marketing of variable rates was premised on offering customers a lower electricity or gas rate than the customer's local utility.

149.    Defendant knew at the time it signed up Mr. Brachvogel and prospective customers that South Bay's variable rates for electricity and gas were consistently substantially higher than Mr. Brachvogel and prospective customer's local utility rate, a rate based on market factors.

150.    Defendant's omission that South Bay's variable rate for electricity or gas was consistently substantially higher than the local utility rate is material to prospective customers.

151.    Defendant's intentional concealments were designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with market prices as specified in the contract.  By concealing its actual pricing strategy (artificially inflating prices and maximizing profits), Defendant deprives consumers from being able to make informed purchasing decisions.

152.    Defendant's practices are unconscionable and outside the norm of reasonable business practices.

153.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and Class Members remained with South Bay and suffered and continue to

suffer an ascertainable loss of monies based on the difference in the rate they were charged

versus the rate they would have been charged had Defendant charged a competitive rate based on

market pricing, as well as the difference in South Bay's variable rate and the default rate utilities

charge, which is the rate Plaintiff and Class Members would have received had the not been

deceived into accepting electricity and gas supply from Defendant.  By reason of the foregoing,

Defendant is liable to Plaintiff and Class Members for trebled compensatory damages, attorneys'

fees, and the costs of this suit.

154.   Plaintiff and the members of the Class further seek equitable relief against

Defendant.  This Court has the power to award such relief, including but not limited to, an order

declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in

any further unlawful conduct, and an order directing Defendant to return to the Plaintiff and the

Class all amounts wrongfully assessed and/or collected.

155.   As a result of Defendant's deceptive acts or practices, Plaintiff and Class

Members suffered actual damages in an amount to be determined at trial, and are entitled to their

damages, costs, and reasonable attorneys' fees and all other relief available under each state's

respective consumer protection statute.

## COUNT V
### Unjust Enrichment
### (On Behalf Of Both Subclasses)

156.   Plaintiff re-alleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

157.   This cause of action is pleaded in the alternative to Plaintiff's contract claims.  To

the extent the Court determines that a valid contract exists between the parties, Plaintiff does not

intend to proceed with his unjust enrichment claim.

158.    Plaintiff and the Class Members conferred a tangible economic benefit upon Defendant by contracting with Defendant for electricity or gas.  Plaintiff and the Class would not have contracted with Defendant for electricity and gas had they known that Defendant would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

159.    Plaintiff and the Class Members would not have purchased energy from Defendant had they known the truth about Defendant's variable energy rates.

160.    By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiff and Class Members.

161.    It would be unjust and inequitable for Defendant to retain the payments Plaintiff and Class Members made for excessive energy charges.

162.    Therefore, Defendant is liable to Plaintiff and Class Members for the damages that they have suffered as a result of Defendant's actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Defendant South Bay has committed the violations of law alleged herein;

(c)    Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(e)     Render an award of punitive damages;

(f)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)     Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine any issue triable of right.


Dated: January 9, 2023
New York, New York                    **WITTELS MCINTURFF PALIKOVIC**

                         By:     J. Burkett McInturff
                                 J. Burkett McInturff
                                 305 BROADWAY, 7TH FLOOR
                                 NEW YORK, NEW YORK 10007
                                 Telephone: (914) 775-8862
                                 jbm@wittelslaw.com

                                 D. Greg Blankinship
                                 Joshua Cottle
                                 **FINKELSTEIN, BLANKINSHIP,**
                                 **FREI-PEARSON & GARBER, LLP**
                                 One North Broadway, Suite 900
                                 White Plains, New York 10601
                                 Telephone: (914) 298-3281
                                 gblankinship@fbfglaw.com
                                 jcottle@fbfglaw.com

                                 *Attorneys for Plaintiff and the Proposed Class*